IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:17-CR-222 |
| | ) | |
| v. | ) | Judge Liam O'Grady |
| | ) | |
| WILLIAM S. WILSON, | ) | Sentencing: October 20, 2021 |
| | ) | |
| Defendant. | ) | |

### POSITION OF THE UNITED STATES
### WITH RESPECT TO SENTENCING

The United States, by and through undersigned counsel, hereby respectfully submits this position paper with respect to the sentencing of defendant William S. Wilson. For the reasons stated in more detail below, the government respectfully requests that this Court impose a lengthy sentence of imprisonment that is sufficient to ensure that Wilson cannot harm any of his victims again.

**I.     Wilson Orchestrated a Complex Fraud and Bribery Conspiracy, and Then Engaged in a Relentless Campaign to Obstruct the Investigation of His Crimes.**

Wilson stands before this Court now convicted of orchestrating a complex, multi-layered corruption conspiracy, and then of engaging in a years-long, dangerously close-to-successful effort to obstruct the investigation of that conspiracy. Wilson's perseverance, brazenness, and skill enabled the corrupt agreement to persist for years without detection, reaped enormous illegal profits for Wilson, caused millions of dollars in financial harm and reputational damage to the United States, and corrupted the innerworkings of a governmental entity that exists for the very purpose of battling corruption. Were it not for the extraordinary efforts of the special agents assigned to this investigation, the crime and the cover-up that followed would have succeeded, and Wilson would remain above the law today.

1

### A.    Wilson Corrupts Timothy Donelson.

Wilson first launched his conspiracy through a years-long, secret agreement to pay kickbacks to Timothy Donelson, a Vice President with Level 3 Communications, LLC ("Level 3").  In return, from at least 2010 through the day he resigned in disgrace from Level 3, Donelson corruptly steered tens of millions of dollars' worth of government subcontracts from Level 3 to Wilson's companies.  *See, e.g.*, GX 1 – GX 21, GX 1407.  Wilson funneled the kickbacks to Donelson in part by making numerous payments to a shell entity that Donelson created and then named "Apposite Services, Inc."  Wilson also passed kickbacks to Donelson by paying for part of two trucks registered in Donelson's name, and by purchasing a plot of land immediately behind Donelson's residence in Winchester, Virginia, thereby doubling the size of Donelson's back yard.  GX 1401.

Wilson and Donelson buried the corrupt nature of these payments by fabricating bogus invoices that purported to be from Apposite Services, and that claimed to charge one of Wilson's companies for the alleged rental of an imaginary bulldozer.  *See* GX 407.  These invoices were ham-handed fabrications.  Throughout the conspiracy, Donelson's company did not own a bulldozer of any kind, much less one it could rent to Wilson.  And ironically, Wilson *did* own a John Deere bulldozer that he bought himself and that he used whenever such equipment was actually needed.  Wilson therefore had no possible reason to rent a bulldozer from Donelson, even if Donelson's pretend bulldozer had been real.  And as the evidence further demonstrated at trial, the supposed work described in the fake Apposite Services invoices either never occurred, could not have required the use of any bulldozer, or was performed by Wilson and his own employees using the John Deere that Wilson himself owned.

In return for the kickbacks secretly passed to him by Wilson, Donelson awarded Wilson's companies numerous, highly lucrative subcontracts to dig trenches and lay cable on projects for various agencies of the United States, and further awarded Wilson's company a subcontract to perform professional services under the WITS3 contract, an area where neither Wilson nor his employees had the faintest hint of relevant training or experience.

During the conspiracy, Donelson personally signed each of the following subcontracts, thereby awarding tens of millions of dollars in revenues to Wilson:

| Approx. Date Executed | Contract / Amendment No. | Subcontractor | Summary of Scope of Work | Contract / Amendment Value |
|---|---|---|---|---|
| 7/7/2010 | 07-MLN-10 | MSO Tech | fiber optic installation work in and near Durham, NC | $493,919 |
| 11/18/2010 | 09-MLN-10 | MSO Tech | established Corporation A as a subcontractor to provide professional services under the WITS3 contract | indefinite quantity; actual billings exceeded $16,000,000 |
| 4/28/2011 | 15-MLN-11 | MSO Tech | fiber optic installation work in and near Kearneysville, WV | $281,338 |
| 5/9/2011 | 19-MLN-11 | MSO Tech | fiber optic installation work in and near McLean, VA | $308,198 |
| 6/17/2011 | 09-MLN-10 Amd. 1 | MSO Tech | amendment broadening the labor categories available under the WITS3 subcontract with Corporation A (amendment to contract executed on 10/18/2010) | indefinite quantity; actual billings exceeded $16,000,000 |
| 11/3/2011 | 34-MLN-11 | PVS | fiber optic installation work in and near Clarksville, VA | $2,223,039 |
| 2/17/2012 | 15-MLN-12 | MSO Tech | fiber optic installation work in and near Durham, NC | $346,796 |
| 3/1/2012 | 22-MLN-12 | MSO Tech | fiber optic installation work in and near Nashville, TN | $2,470,713 |
| 3/2/2012 | 25-MLN-12 | MSO Tech | fiber optic installation work in and near Hanscom AFB | $2,764,870 |
| 3/6/2012 | 32-MLN-12 | MSO Tech | fiber optic installation work in and near Philadelphia, PA | $463,195 |
| 3/6/2012 | 21-MLN-12 | PVS | fiber optic installation work in and near Jacksonville, FL | $2,270,614 |
| 9/21/2012 | 59-MLN-12 | MSO Tech | fiber optic installation work in Washington, DC | $2,106,534 |
| 9/21/2012 | 60-MLN-12 | MSO Tech | fiber optic installation work in Washington, DC | $197,328 |

| Approx. Date Executed | Contract / Amendment No. | Subcontractor | Summary of Scope of Work | Contract / Amendment Value |
|---|---|---|---|---|
| 9/21/2012 | 63-MLN-12 | MSO Tech | fiber optic installation work in and near Big Pool, MD, Charles Town, WV, and Shenandoah Junction, WV | $42,415 |
| 10/2/2012 | 34-MLN-11 Amd. 2 | PVS | fiber optic installation work in and near Clarksville, VA (second amendment to contract executed on 11/3/2011) | increased contract value to $3,623,252 |
| 10/15/2012 | 21-MLN-12 Amd. 1 | PVS | fiber optic installation work in and near Jacksonville, FL (amendment to contract executed on 3/6/2012) | increased contract value to $2,588,422 |
| 1/19/2013 | 32-MLN-12 Amd. 1 | MSO Tech | fiber optic installation work in and near Philadelphia, PA (amendment to contract executed on 3/6/2012) | increased contract value to $948,929 |
| 5/24/2013 | 18-MLN-13 | MSO Tech | fiber optic installation work in and near Ashburn, VA | $106,285.34 |
| 8/8/2013 | 32-MLN-12 Amd. 2 | MSO Tech | fiber optic installation work in and near Philadelphia, PA (amendment to contract executed on 3/6/2012) | increased contract value to $1,781,999 |
| 8/12/2013 | 25-MLN-12 Amd. 1 | MSO Tech | fiber optic installation work in and near Hanscom AFB (amendment to contract executed on 3/2/2012) | increased contract value to $6,929,562 |

*See* GX 1 – GX 21, GX 1407.  During the conspiracy, no one at Level 3—other than Donelson—awarded a subcontract to Wilson's companies for any project of any kind.  And since the day that Donelson resigned in disgrace, no one at Level 3 has awarded any business to Wilson *whatsoever*.

Throughout the conspiracy, moreover, Level 3 was an enormous, multi-national corporation with extensive commercial relationships in its various areas of expertise.  As illustrated through the testimony of David Scotidas, Level 3 had numerous qualified construction companies who easily could have performed all of this work.  Despite these ready and capable options, MSO Tech was reflexively chosen for projects, even where the bids submitted by MSO Tech were higher than and grossly out of proportion to the prices charged by other vendors.  The evidence now makes plain that these commercially irrational decisions were driven by the secret, corrupt bargain between Wilson and Donelson.

B.      **Wilson Corrupts Ronald Capallia.**

Wilson was not content to corrupt only Donelson, however.  Beginning in 2012, Wilson set out on an explicit, successful campaign to corrupt Ronald Capallia, thereby guaranteeing the continued flow of unearned work from Level 3 to Wilson's companies.  Wilson funneled these kickbacks to Capallia through hundreds of thousands of dollars of funds deposited into Capallia's bank account, by purchasing two brand new automobiles for Capallia (each worth over $40,000), by paying for over $70,000 in Disney Caribbean cruises, airfare, and hotel accommodations for Mr. Capallia, the Capallia family, and in some instances babysitters and friends to accompany the Capallias, and by purchasing numerous pieces of Apple computer equipment for the Capallias' personal enjoyment.  GX 1403A – 1403D.

As with the corrupt payments to Donelson, Wilson sought to conceal the kickbacks to Capallia by inventing the paper-thin pretext that Ronald Capallia's wife, Natalie Capallia, was employed by MSO Tech, and that the payments were of course salary for her supposed work.  In truth, Ms. Capallia did not even meet Wilson until more than a year after Wilson began depositing money in the Capallias' joint bank account, has never spoke to Wilson about the supposed job, and did at most a few hours of make-work performing routine Google searches, nominally on behalf of Wilson, that she did only after the co-conspirators learned that investigators were on to their scam.

In return for the kickbacks secretly passed to him by Wilson, Ronald Capallia approved or directed the approval of hundreds of purchase orders from Level 3 to Wilson's companies, approved the payment of millions of dollars of invoices submitted by Wilson to Level 3 through Mr. Capallia, and repeatedly caused Level 3 to buy goods and services from MSO Tech when it made no business sense to do so.  And as noted below, Mr. Capallia also prepared numerous

false and fraudulent service orders that he sent to Matthew Kekoa LumHo for LumHo's approval, which put millions of dollars in unearned profits into Wilson's pocket.

### C.      Wilson Corrupts Matthew Kekoa LumHo.

Wilson could advance only so far by corrupting just Donelson and Capallia.  That was not enough for Wilson, so he chose to bribe Matthew Kekoa LumHo just as he had corrupted the others.  Throughout the conspiracy, LumHo was employed at the DODIG, serving as a Designated Agency Representative ("DAR") for the WITS3 contract.  As Wilson and the other members of the conspiracy quickly learned, LumHo was authorized to place orders for goods and services through WITS3, subject to almost no meaningful oversight.

In much the same way that Wilson paid kickbacks to Ronald Capallia, Wilson bribed LumHo by funneling money to LumHo through a bank account that LumHo opened in the name of his father-in-law, Fidel Ramos.  And as with the fake job for Natalie Capallia, Wilson sought to conceal the true nature of these bribe payments by claiming falsely that Mr. Ramos worked for MSO Tech, and that the payments were Mr. Ramos's salary.  In truth, Mr. Ramos had never heard of Wilson or MSO Tech—much less worked for Wilson's company—and was unaware that the bribery payments were passing through his bank account until interviewed by law enforcement.  In short, Wilson and LumHo conspired not only to commit bribery, but to use Mr. Ramos as an unwitting shill in their conspiracy.

Wilson also bribed LumHo by providing him with stereo equipment, photography equipment, and computer electronics.  Wilson and LumHo concealed these bribes by hiding them in various fraudulent service orders that LumHo was placing via the WITS3 contract.  For example, in June 2012, Wilson sent a list of electronic equipment to Capallia which included a high-end Canon EOS 60D digital camera, and related computer accessories.  Wilson advised,

"Ron add your cost to this and send it to Kekoa."  Capallia in turn prepared a fraudulent service order request form that falsely described these items as 768 hours of professional "cable installer" services, at a cost to the government of $54,320.64.  LumHo signed off on the fraudulent service order knowing it to be false, while Wilson arranged for these items to be delivered to LumHo.  Thus, Wilson, Capallia, and LumHo jointly caused the United States to pay over $54,000 for camera and other equipment that Wilson used to bribe LumHo.

In return for the bribes secretly passed to him by Wilson, LumHo took numerous official acts to benefit Wilson and his companies.  LumHo pressed for the DODIG to buy goods and services using the WITS3 contracting vehicle, ensuring that he could control the process, rather than using any number of other contracting mechanisms available to the DODIG that he could not influence.  Once the decision had been made to use the WITS3 vehicle, LumHo unilaterally selected Level 3 as the vendor to supply the goods or services, without affording Verizon any opportunity to compete for the business, as would have been the case in a non-corrupted contract award.  LumHo did so knowing full well that Level 3 (acting through Donelson and Capallia) would subcontract all of the work to Wilson, who would return part of the profits to LumHo in the form of bribes.  And as described in more detail below, LumHo repeatedly signed or directed his subordinate to sign false service orders that he knew to be fraudulent, knowing that in so doing, he was putting money into Wilson's pocket, and that Wilson would do the same for him.

**D.   The Co-Conspirators Bilk the System.**

Once Wilson had corrupted all of the key decisionmakers in the process, he and his compatriots worked in concert to submit false and fraudulent claims to the government under the WITS3 contract.  With the corrupt bargain in place, the co-conspirators recognized that they could maximize Wilson's profits by buying standard, commercially available items such as

7

computer software, hardware, and accessories, and routine office moving services, significantly inflating the price to the DODIG, and then falsely billing the government as though it had been supplied with various high-end professional services that could be ordered under the WITS3 contract.

For example, in January of 2012, the DODIG was in the process of moving equipment from its old offices in Arlington, Virginia, to its current offices in Alexandria, Virginia.  The DODIG had a number of contracting options that it could have used to hire a qualified, affordable office moving company.  Indeed, the DODIG had previously used a different contracting vehicle to hire a reputable moving company that performed excellent work during a prior office move.  The WITS3 contract, on the other hand, cannot lawfully be used to hire office movers.

Nevertheless, Capallia prepared and LumHo directed the approval of a fraudulent WITS3 service order to push this work through the WITS3 contract and steer it to MSO Tech, a Florida trench-digging company with no experience whatsoever performing office moves.  Once the co-conspirators ensured that MSO Tech was selected, Wilson hired Donny Ravas to perform this critical task.  Mr. Ravas knew Wilson's employee, Barry Atwood, from their years hanging out together.  But as of late 2011, Mr. Ravas held no security clearance whatsoever, GX 248, lacked an incorporated business, GX 804, and had no employees of any kind.  Mr. Ravas then subcontracted the actual moving work to local moving company Blake & Sons Moving & Storage, Inc., who arranged for a total of around 332.5 hours of routine office moving services at a price of $38.50 per hour.  GX 913 – 915, GX 1406.

The fraudulent service order drafted by Capallia and approved by LumHo did not, however, describe this farce as what it was.  The co-conspirators instead fraudulently billed the

8

work as 4,171 hours of professional cable installation services, performed outside of normal business hours, at a price of $106.09 per hour, for a total cost of $442,501.39.  GX 76B.  The co-conspirators thereby ensured that the DODIG hired a telephone company, to in turn hire a Florida trench-digging company, to in turn hire Barry Atwood's Hagerstown pal, to in turn hire a Rockville moving company, to move boxes for a few nights in Alexandria at a cost of $442,501.39.

### E.    Wilson Launches a Relentless Campaign to Obstruct the Investigation.

Beginning in or around early 2014, Wilson learned that investigators were beginning to look into his conduct.  From that moment on, Wilson engaged in one of the most persistent efforts at obstruction imaginable.

Upon learning that a document subpoena would soon be served on Level 3, Wilson caused MSO Tech's email server to be destroyed.  Soon thereafter, Wilson directed that his employee, Sandy Darden, destroy Wilson's Toughbook laptop by burning it in a fire.

Immediately after learning that Donelson and Capallia had resigned from Level 3 in disgrace, Wilson orchestrated a secret meeting in a parking lot outside of a Cracker Barrel at the border between North and South Carolina.  The co-conspirators selected this location for their in-person meeting, hundreds of miles away from any of their residences, because they feared that their phones were tapped.  During the meeting, Capallia overheard Wilson and Donelson discussing the need to get their "invoices" straight.  And Wilson sternly admonished Capallia to stick to the fake story that Natallie Capallia supposedly had a job working for Wilson.

A month or so later, believing he had nowhere else to turn, Capallia moved his entire family from West Virginia to a residence owned by and immediately adjacent to Wilson's residence in Lake Butler, Florida.  Soon thereafter, Wilson took Capallia out on boat on a nearby

lake late at night.  While the two men were alone, Wilson vowed that he would murder Capallia's wife, Capallia's two young children, and Capallia himself, and thereafter submerge their bodies in the lake where they would never be found, should Capallia ever testify against Wilson.

In March 2014, special agents with DCIS interviewed Wilson near a deserted gas station outside of Jacksonville, Florida.  During that interview, Wilson was evasive and flat-out lied in response to the agents' questions.  The defendant also cursed, used an obscene gender-related epithet directed at his ex-wife, and declared that he wanted to kill her.  He then slammed his hand on the back of his truck and threatened to beat the interviewing agents with firewood, which was located on the back of his truck, if the agents mentioned his ex-wife again.

In April 2014, special agents with DCIS interviewed Wilson again, this time at a hotel in Alexandria, Virginia.  During that interview, Wilson falsely claimed to law enforcement that: (i) he had never provided Donelson with anything of value other than one vehicle; (ii) he had purchased a vehicle for Natalie Capallia to enable her to survey land on his behalf; (iii) that in the course of her supposed job, Natalie Capallia had identified investment properties for Wilson to purchase that were located in Florida and Georgia; and, most absurdly (iv) that one of the Disney Caribbean cruises he bought for the Capallias was in fact a business trip where Ms. Capallia was researching real estate on Wilson's behalf.  These falsehood form the basis of Wilson's conviction in Count 14 of the Superseding Indictment.

In 2016, in response to a civil investigative demand served in the parallel civil investigation, Wilson produced the clumsily fabricated invoices purportedly from Apposite Service, thereby representing that those documents were a legitimate record of a real transaction. *See* GX 407.

In June 2016, Wilson sat for a lengthy, sworn civil deposition held inside the United States courthouse for the Middle District of Florida.  GX 400.  At the outset of that deposition, the assigned civil Assistant United States Attorney admonished Wilson explicitly that there was a pending criminal investigation, that Wilson had a right to refuse to answer any question if a truthful answer would tend to incriminate him, that anything Wilson said during the deposition could be used against him, and that lying during the deposition would itself be a new crime.  GX 400 at 4-6.  Wilson nevertheless testified at length, telling preposterously transparent lies.  Those lies form the basis of the false statements described in Count 15, for which the jury convicted him.

In July 2016, special agents from DCIS and the FBI executed a court-authorized search warrant at the offices of MSO Tech and PVS Inc. in Lake Butler, Florida.  After learning that the search was ongoing, Wilson charged to the scene and engaged in a hostile stand-off with the searching agents, during which he claimed that he had the area surrounded with men and asked if the agents wanted him to call those men off.  An agent searched Wilson for weapons at that time and found none on his person.  The defendant then left the scene in his truck.

Sometime thereafter, Wilson came driving back to the neighborhood of the search warrant at a high rate of speed, stopping suddenly just outside the perimeter established by the searching agents.  Wilson refused to comply with repeated requests to get out of the truck and show his hands.  Agents providing security at the search warrant were forced to confront Wilson, with firearms pointed directly at his head, and to order him loudly and repeatedly to show his hands and get out of his truck.  After a lengthy pause, Wilson finally relented and stepped out of the vehicle.

When Wilson ultimately emerged from his truck, the agents observed that he was newly

armed with a knife in his front pocket, which was not previously on his person.  Agents also observed a firearm inside the cab of the truck he had just driven to the brink of the perimeter.  In other words, the defendant left the scene of an active law enforcement search, after making explicit threats to federal agents, and returned with multiple weapons.  Additional weapons, including firearms, were also found inside of the offices of the defendant's businesses during the search.

At or around the time of the search warrant, special agents also served a series of grand jury subpoenas on several of Wilson's employees.  These included a subpoena compelling the live testimony of L. C. Simmons before the grand jury in Alexandria.  As the Court will recall, Mr. Simmons served as one of Wilson's construction project managers and was intimately familiar with the operations of MSO Tech and the use and maintenance of all of its heavy equipment.  When serving this subpoena, the FBI agents showed Mr. Simmons the fake Apposite Services invoices, and inquired about his knowledge of the supposed work.

After the initial contact from the FBI, but before a follow-up interview at the United States Attorney's Office in Alexandria, Mr. Simmons spoke with the defendant to ask him about the investigation.  Wilson instructed Mr. Simmons to falsely profess his ignorance of the relevant facts.  When Mr. Simmons pressed Wilson about the obviously fake invoices, the defendant replied with words to the effect of, "You don't know anything about that."  GX 504 at 53.  In fact, however, Mr. Simmons did know quite a bit about those fake invoices—*i.e.*, that the work never happened or was done by Mr. Simmons himself—despite the defendant's best efforts to silence him.

October 4, 2017, Wilson was arrested by a team of federal agents pursuant to the warrant issued on the original Indictment in this case.  Despite the overwhelming number of agents

present, Wilson resisted arrest and made additional threats of violence to law enforcement. When he was first approached and informed that law enforcement agents had a warrant for his arrest, the defendant refused to comply with repeated instructions to put his hands behind his back and surrender peacefully to authorities. Instead, he declared to the agents that they were going to have to "talk about this in my office." The agents were aware, based on the prior law enforcement search, that the defendant kept firearms in his office. Wilson then turned and began to walk towards his office (where he later announced that he had thousands of rounds of ammunition and a cache of explosives). Multiple armed agents surrounded him, and yet the defendant continued to resist arrest to the point that five agents had to hold him against the wall of a building and place three sets of handcuffs on him.

Once in custody, the defendant continued to struggle and make threats that he would harm the agents if the handcuffs were not removed. While the defendant was escorted to the transport vehicle, he continued to struggle and overheard an agent talking about transporting him to Jacksonville. The defendant stated, "I am not going to Jacksonville." The agents placed him into the vehicle and the defendant continued to struggle. He complained that his handcuffs were too tight and stated that he would "use force" and "get violent" if they were not fixed. And even after the handcuffs were loosened at his request, as he was being transported to his initial appearance, the defendant continued to make threats of violence to the agents. He then asked the transporting agents, "Where was the ATF today?" The agents stated that there were no ATF agents present at his arrest. The defendant replied that he had 20,000 rounds of ammunition and explosives in his office.

The government sought to detain Wilson pre-trial, first in the Middle District of Florida where he was arrested, and then through an appeal to this Court. Wilson took the stand and

testified under oath, falsely, at both proceedings. Most notably, in his detention hearing before this Court in October 2017, Wilson had the gall to tell this Court that he *cooperated* with this investigation, and claimed further that he in fact hired Natalie Capallia to search for investment properties on his behalf.

This Court chose to show Wilson mercy at the first detention hearing, and agreed to release Wilson on a series of restrictive conditions intended to prevent future harm by the defendant. Among other things, this Court appointed Wilson's wife, Michele Mello, as his third-party custodian. Wilson thus had the benefit of this Court's supervision, the threat of pending trial, and his own wife's guidance to help him comply with the law. It was not enough.

In December 2019, while awaiting the second trial in this case, Wilson became enraged when a music application on his smartphone failed to work as he wanted. Wilson lashed out by smashing a glass sugar jar over his wife's head, which lacerated her scalp and left a trail of blood through the house. When local sheriff deputies arrived in response to Ms. Mello's calls for help, Wilson hid in the woods behind his house, repeatedly refused to show his hands to the arresting officers, and was taken into custody only after being tazered twice.

To this day, Wilson has demonstrated no remorse for his corruption, or for his years-long effort to obstruct the rule of law.

## II.     Sentencing Argument

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable

14

Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  In *Gall*, the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id*. at 596-97. The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260-61.

### A.      Guidelines Range

The United States joins in the Sentencing Guidelines calculations set forth in the final Pre-Sentence Report as to defendant Wilson.  Dkt. No. 342.  The PSR correctly calculates the total offense level of 42, and a criminal history category of I, resulting in an advisory guideline range of 360 months to life.  Dkt. No. 342 at 42.

### 1.      *Base Offense Level: 12*

The Presentence Investigation Report ("PSR") correctly applies § 2C1.1, as the guideline that governs this case, since the defendant was convicted of paying bribes to a public official. *See* PSR ¶ 124.  The base offense level is therefore 12 under § 2C1.1(a)(2) and § 2X1.1(a).

### 2.      *More Than One Bribe: +2*

The Probation Officer correctly applies a two-level enhancement under § 2C1.1(b)(1), because the offense involved more than one bribe. Indeed, the jury convicted the defendant of

Count 10 of the Superseding Indictment, which charged the defendant with paying the following series of bribes:

- approximately $23,595.12 in multiple payroll checks for the Fidel Ramos no-show job

- electronics and camera equipment, including two Bose Sounddocks, a Canon digital camera, two Canon telephoto and zoom lenses, a Canon flash lighting accessory, and other camera accessories worth thousands of dollars

The evidence at trial, summarized in GX 1402, proved beyond a reasonable doubt all of these bribes in their various forms.

> 3.      *Wilson Received Profits of Over $3.5 Million Due to the Bribery: + 18.*

The Probation Officer correctly applies an eighteen-level enhancement for loss under §§ 2C1.1(b)(2) and 2B1.1(b)(1)(J).  Section 2C1.1(b)(2) directs:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2).  The application notes to § 2C1.1 further explain that "[t]he value of 'the benefit received or to be received' means the net value of such benefit."  § 2C1.1 note 3.  The application notes further explain how the net value should be calculated: "A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000."  *Id*.

As directed by Application Note 3, the government's calculation of "the benefit received" by Wilson is his profits from the corrupt bargain—in other words, the difference between what Wilson received from Level 3, and what Wilson himself paid for the actual goods or services provided under the corrupted WITS3 contract.

As demonstrated at trial, GX 1405 is a chart that summarizes the profits reaped by

Wilson under the corrupted WITS3 contract.  The chart was prepared by FBI Forensic

Accountant Rachael Bingham.  In preparing this calculation, Ms. Bingham took the total of all

gross receipts paid from Level 3 to MSO Tech under the WITS3 contract, *see* GX 23, and then

subtracted all out-of-pocket costs incurred by MSO Tech in providing the goods or services

under the WITS3 contract.  As shown by Ms. Bingham's calculation, MSO Tech reaped a total

of $8,992,544.07 in profit under the corrupted WITS3 contract.  *See* GX 1405.  Accordingly,

pursuant to § 2C1.1 and § 2B1.1(b)(1)(J), the offense level is increased by 18 levels because the

amount of the loss was more than $3,500,000 but not more than $9,500,000.

> 4.    *The Offense Involved A Public Official in a High-Level Decision-Making or Sensitive Position: +4*

The Probation Officer correctly applied a four-level enhancement under § 2C1.1(b)(3)

because the offense involved "any public official in a high-level decision-making or sensitive

position." U.S.S.G. § 2C1.1(b)(3).  The commentary defines "high-level decision-making or

sensitive position" to mean "a position characterized by a direct authority to make decisions for,

or on behalf of, a government department, agency, or other government entity, or by a substantial

influence over the decision-making process."  § 2C1.1 note 4(A).  LumHo's role as a DAR

undeniably gave him "substantial influence," if not unilateral control, over the WITS3 contract.

Moreover, courts have affirmed the enhancement for government contracting officers,

program managers, and those who exert control or influence over purchases or disposition of

property – positions of far less responsibility or power than LumHo exercised as the DAR under

WITS 3. The Fourth Circuit recently affirmed that the enhancement applied to a government

employee who lacked authority to sign contracts or purchase orders, but whose advice was

critical in the final decision. *United States v. Conrad*, 760 F. App'x 199, 210 (4th Cir. 2019)

(although "appellant did not have independent authority to award the contract, the record reflects

that as the official leading the data migration project, Appellant's recommendation of who should win the contract was given substantial deference.").

Likewise, in *United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994), a defendant had bribed a supervisory engineer at the Navy who had responsibility for the technical aspects of major procurements. *Id*. at 1016. In return, the engineer passed nonpublic information to the bribe payer, recommended to a contract review panel that the bribe payer's clients win contracts, and sought to ensure that certain contracts were awarded without competition. *Id*. at 1016-17. This Court held that the engineer's ability to pass on non-public information and to make *recommendations* to the Navy about who should be awarded the contracts meant that the enhancement applied. *Id*. at 1021.

LumHo exercised far more control over the WITS3 ordering process than the officials in *Conrad* and *Matzkin*. Accordingly, the conspiracy involved a high-level decision-making official, and the enhancement therefore correctly applies to Wilson.

> 5.    *The Defendant Was The Organizer and Leader of the Conspiracy Involving Five or More Participants that Was Otherwise Extensive: +4*

The PSR also correctly applies a four-level enhancement pursuant to § 3B1.1 because Wilson led and organized the conspiracy, which involved five or more people and was otherwise extensive. First, the crimes at issue in this case involved at least five participants. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." § 3B1.1 note 1. As shown at trial, the conspiracy involved Wilson, LumHo, Donelson, Capallia and Atwood. Wilson, moreover, wrapped Ms. Capallia into his crimes when he instructed her, through Ronald Capallia, to falsely backdate a check to try to conceal the true nature of the kickbacks he had paid to Mr. Capallia.

Second, even if there were fewer than five "participants," the conspiracy was "otherwise

18

extensive."  The application notes explain:

> In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

§ 3B1.1 note 3.

Here, Wilson's conspiracy involved the knowing participation of numerous individuals, plus the unwitting assistance of equipment vendors, a moving company, Level 3 employees, DODIG officials, and Wilson's own employees.  The conspiracy thus meets this test.

Third, the defendant organized, led, and managed the conspiracy.  The evidence at trial, summarized above, and described in detail in the PSR shows that Wilson corruptly recruited Donelson, Capallia, and LumHo to join his plot.  He monitored their actions and at times directed their conduct.  Most telling, moreover, is the fact that Wilson personally reaped nearly *$9 million* in profits, while the others received a small fraction of that amount.  GX 1405.  This four-level enhancement correctly applies.

### 6.    *The Defendant Obstructed Justice: +2*

The Pre-Sentence Report correctly applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on defendant's obstructive behavior throughout the investigation of this case.  Without belaboring the point, the evidence set forth above and elicited at trial proves that Wilson sought to obstruct the investigation time and again through destroying evidence, attempting to tamper with the testimony of L.C. Simmons, lying on material matters to law enforcement agents, blatantly committing perjury during his civil deposition, and threatening in graphic detail to murder Ronald Capallia if he ever testified.

### B.       Section 3553(a) Factors

Pursuant to the factors set forth in 18 U.S.C. § 3553(a), the government recommends that this Court impose a substantial sentence of imprisonment within the advisory guideline range.

### 1.       *The Sentence Should Reflect the Nature and Circumstances of the Offense.*

The nature and circumstances of Wilson's crimes, both in orchestrating the conspiracy and relentlessly seeking to obstruct the investigation, call for a substantial term of imprisonment. Crimes committed in concert with corrupt public officials are particularly insidious because they destroy the community's faith in its own governmental institutions. *See United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill), aff'd 447 F.3d 517 (7th Cir. 2006) ("Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials").  As the Eleventh Circuit held:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). The same is true here.

Wilson led this conspiracy for years in ways that illustrate both the darkness of his character and the dangerousness of the crime.  For the conspiracy to take root, the crime needed someone who had a sufficient understanding of the systems within Level 3 and the DODIG, of the flaws therein, and of how those flaws might be exploited to defraud the government for the benefit of Wilson.  Wilson had or gained those insights, and sought eagerly to exploit them for his corrupt purposes.  He saw that Level 3's contracting process could be corrupted to ensure that

business came to him; he recognized that the DODIG's use of WITS3 was ripe to be abused.

Nevertheless, the conspiracy could not have succeeded as well as it did without willing participants at all levels of the process.  And that required Wilson to identify the key people to join the scheme.  Throughout the conspiracy, Wilson exhibited an uncanny ability to identify those around him who both held power and were corruptible, and the astonishing gall to come right out and bribe them when it advanced his interests.

Wilson recognized both that Donelson was a key decisionmaker within Level 3, and that he was more than willing to accept kickbacks.  Wilson then corrupted Donelson by paying hundreds of thousands of dollars into the accounts of a shell entity owned by Donelson, and further concocted a false story about payments for the rental of a bulldozer that both men knew was a preposterous lie.

Wilson understood that Capallia held a critical position within Level 3 enabling him to alter the day-to-day operations of that company's internal acquisition process; he also saw a willingness in Capallia to do whatever Wilson needed in exchange for kickbacks.  And from there, Wilson had the astounding gall to offer to give Capallia cash in an envelope, to offer to fund the tuition of the Capallia children at a private school, and then finally to engage in the pretext of pretending to hire Natalie Capallia for a job that never existed, so that he could dump hundreds of thousands of dollars into Capallia's pocket.

Wilson further had the keen eye to understand the weakness in the WITS3 process, to identify LumHo as the key person controlling that process, and then the unique vision to recognize that LumHo—a man supposedly sworn to root out corruption—was the fraud that he turned out to be.  A savvy and determined criminal might have recognized one of these opportunities.  Wilson capitalized on them all.

When Wilson's scheme began to unravel, he set out on a years-long, relentless campaign to obstruct this investigation in any way possible.  Through his actions, Wilson sought to avoid accountability for his crimes at all costs.  He threatened to murder Ronald Capallia and his entire family merely because of the possibility that Capallia might some day tell the truth.

Wilson destroyed evidence.  He participated in the creation of fictitious invoices to conceal the scheme.  He sat for a day-long civil deposition wherein he lied under oath repeatedly, brazenly, and transparently.   He engaged in an armed standoff with law enforcement agents merely because they were lawfully executing a court-issued warrant.  He sought to tamper with the testimony of witnesses called before the grand jury.  He wrestled with and threatened law enforcement agents with violence for having the audacity to execute a duly authorized, court-issued arrest warrant.  Despite the advice of competent counsel, he took the stand and lied repeatedly at his bond hearings in the Central District of Florida and before this Court.  And when this Court finally released him on bond, he violated those conditions as well, to say nothing of the trust of his wife.  By impeding the ability to obtain the truth and undermining the integrity of the process, Wilson attacked the very core of our judicial system. *See United States v. Alvarez*, 567 U.S. 709 (2012).

> 2.    *The Sentence Must Promote General Deterrence.*

A significant sentence is also called for in this case to promote general deterrence.  Absent a meaningful term of imprisonment, general deterrence —"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved. *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976).

Intentional, calculated conduct like the conspiracy hatched by Wilson calls for a significant term of incarceration to deter others from making similar decisions. *See United States v. Shortt*, 485 F.3d 243, 251-52 (4th Cir. 2007) ("As a practical matter, extensive efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme."); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted).  *See also United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (affirming sentence where the "judge stressed the corrosive effect that corruption has on the public trust and expressed his belief that the scandals will not end unless they are treated 'appropriately hard' ").

Moreover, the sophistication of the scheme and the built-in opaqueness of government procurement processes all created opportunities for obfuscation and misdirection by the co-conspirators.  These factors made the crime more difficult to unravel, and thereby deserving of greater punishment than an ordinary fraud.  *See, e.g.*, *United States v. Hefferman*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); see also *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized.").

With respect to public corruption schemes of this level of complexity, especially in light of the difficulty of detection and the potentially enormous financial windfall from pulling them off, only imprisonment can effectively promote general deterrence. *See United States v. Hayes*,

762 F.3d 1300, 1311 (11th Cir. 2014) (recognizing that a sentence of probation is ineffective in deterring corruption).

        3.     *The Sentence Should Be Crafted to Ensure that Wilson Does Not Harm His Victims Ever Again.*

Wilson's conduct throughout the conspiracy and his unrelenting campaign of obstruction further show that he is badly in need of incapacitation. Wilson's ability to cobble together all of the pieces of the corrupt bargain, to recognize the deep flaws in others, and to exploit those for his own dark purposes all show that he remains a threat to commit more crimes in the future. Wilson's crimes in this case required no special training, licensure, or certification. Rather, he carried them out by force of his greed and his ability to recognize the worst in others. Those abilities will remain notwithstanding this felony conviction.

Wilson's behavior once he learned of the investigation provides an even darker foreshadowing of what is to come. At every possible turn, Wilson acted as though he were above the law, and was willing to do anything to escape responsibility. To this day, he appears to blame everyone other than himself for his downfall. He has not exhibited remorse or accepted responsibility for his actions. He is, therefore, a prime example of an individual who requires specific deterrence.

It is well-settled that "lack of remorse is a fact that a district court can consider in its evaluation of the § 3553(a) factors." *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090–91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States v. Mitchell*, 681 F.3d 867, 884–85 (6th Cir. 2012) (bribery case; distinguishing lack of remorse,

where defendant persisted in denying his involvement following jury verdict, from exercise of trial right); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236–37 (1st Cir. 2008) (rejecting argument that including lack of remorse in section 3553 analysis was unfair "double counting" where court also denied downward offense level adjustment for acceptance of responsibility); *United States v. Smith*, 424 F.3d 992, 1016–17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack of remorse).

Moreover, as the Court needs no reminding, Wilson threatened to murder Ronald Capallia and his entire family should Mr. Capallia ever testify against him. Both Mr. Capallia and Ms. Capallia have now done just that. The government respectfully urges the Court to craft a sentence that is long enough to ensure that whenever Wilson completes his sentence, he is no longer capable of making good on his promise.

4.    *The Sentence Should Promote Respect for the Rule of Law.*

Wilson's crimes strike at the heart of the rule of law. He corrupted the innerworkings of an agency dedicated to stopping corruption. He defrauded the United States of millions of dollars, and he succeeded in tricking the government into paying for the very bribes he gave to LumHo.

He sought at every turn to interfere with our system of justice, first through the crime itself, then through his furtive efforts to destroy evidence and hold secret meetings where the confederates got their stories straight. He sought to silence witnesses by threatening them, attempted to suborn perjury before the grand jury, threatened honest law enforcement officials with violence just for doing their jobs, blatantly lied under oath in a civil deposition, and then lied to this Court in his bid to be released on bond.

25

The government respectfully urges the Court to impose a sentence that will stand as a rebuke to Wilson's lawlessness, and that will reassure all of those who were harmed by his crimes, and all those who stood up to his corruption, that no one is above the law.

## III.   Conclusion

Based on the foregoing, the government respectfully recommends that the Court impose a sentence within the advisory guideline range.  To the extent that this Court determines to impose a sentence below the advisory range, the government nonetheless respectfully urges the Court to fashion a sentence of sufficient length that it effectively incapacitates Wilson from ever harming his victims again.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:        /s/ Matthew Burke
Matthew Burke
Russell L. Carlberg
Assistant United States Attorneys
Eastern District of Virginia
Counsel for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel.: (703) 299-3700
Fax:  (703) 299-3981

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of October, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

A copy also will be sent via email to:

> Kelly M. Smihal
> Senior United States Probation Officer
> Kelly_Smihal@vaep.uscourts.gov

        /s/ Matthew Burke
Matthew Burke
Assistant United States Attorney

27