## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No: 1:17CR222-01** |
| | ) | **The Honorable Liam O'Grady** |
| **WILLIAM S. WILSON** | ) | |
| **Defendants.** | ) | |

### DEFENDANT'S POSITION WITH RESPECT TO SENTENCING

The defendant, William S. Wilson, by and through undersigned counsel, pursuant to 18 U.S.C. §3553(a) and §6A1.3 of the United States Sentencing Guidelines (hereinafter U.S.S.G.), submits the following Position with Respect to Sentencing.  In accordance with U.S.S.G. §6A1.2 Counsel certifies that he reviewed the Presentence Investigation Report (hereinafter PSR) with Mr. Wilson.  Further, Mr. Wilson objects to the determination that he qualifies for an organizer role enhancement pursuant to U.S.S.G. §3B1.1(a) and a high-level public official enhancement pursuant to U.S.S.G. §2C1.1(b)(3).[1]  As a result, the appropriate Total Offense Level is 34 with a corresponding guideline range of 151 to 188 months under Criminal History Category I. However, this guideline range does not adequately address certain specific characteristics of Mr. Wilson and is not an appropriate measure of his culpability in the present case.   Based on the considerations set forth in 18 U.S.C. §3553(a), Mr. Wilson requests that this Court impose a sentence below the low end of this guideline range.  A sentence of 72 months followed by a three-year term of supervised release is sufficient, but not greater than necessary, to address these considerations.

---

[1] For the purpose of preserving any potential issues for appeal, Mr. Wilson also objects to the enhancement for more than one bribe pursuant to U.S.S.G §2C1.1(b)(1) and for obstruction of justice pursuant to U.S.S.G §3C1.1. However, in light of the verdict, Mr. Wilson will not pursue those arguments at sentencing.

## I.     <u>Disputed Factors</u>

Pursuant to §6A1.3 of the Sentencing Guidelines the Court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.  When any factor is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the Court regarding that factor.  The government bears the burden of proving the applicability of a sentencing enhancement. *See, e.g., United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014).

As an initial matter, Mr. Wilson agrees with the calculation of the sentencing guidelines contained in a letter the government submitted to the probation officer on August 27, 2021. (Exhibit 1) This letter concluded: "[a]ccordingly, the government's position is that the final offense level applicable to Wilson is 34."[2]  The government's final offense level is based on the following calculation:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (Section 2X1.1(a)) | 12 |
| Loss amount greater than $3,500,000 but not more than $9,500,000 (Section 2B1.1(b)(1)(J)) | +18 |
| Offense involved more than one bribe (Section 2C1.1(b)(1)) | +2 |
| The defendant willfully obstructed justice (Section 3C1.1) | +2 |
| TOTAL | 34 |

---

[2] After undersigned counsel informed the probation officer that Mr. Wilson agreed with the government's calculation of the sentencing guidelines in its August 27, 2021, letter, the government indicated in an email to the parties that the letter was "incomplete as it did not account for all the applicable enhancements." However, the government previously submitted a letter to the probation officer for Mr. Capallia's PSR that also did not include the public official enhancement. In that case, the probation officer included the enhancement in Mr. Capalia's guidelines calculation.  Knowing this, the government nevertheless, chose not to include it in its proposed calculation for Mr. Wilson.

A total offense level of 34, criminal history category I, corresponds with a sentencing guideline range of 151 to 188 months.

### A.    Leadership Role in the Offense

In the present case, the Probation Officer noted in paragraph 109 of the PSR that Mr. Wilson qualifies for a four-level aggravating role enhancement for being a leader or organizer pursuant to U.S.S.G. §3B1.1(a).  However, based on the offense conduct and the charging decisions made by the government, Mr. Wilson should not receive this adjustment.

Together, §§3B1.1 and 3B1.2 serve the guidelines' objective of ensuring that sentences appropriately reflect the defendant's culpability and specific offense conduct by creating an eight-level range of enhancements and reductions of the defendant's base offense level. To this end, §3B1.1 increases the defendant's base offense level up to four levels if he or she served as an organizer, leader, manager, or supervisor in certain criminal activity, whereas §3B1.2 decreases the defendant's base offense level up to four levels if he or she served as only a minor or minimal participant in the criminal activity.

"Factors the court should consider [when increasing the defendant's base offense level] include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the alleged activity, and the degree of control and authority exercised over others." §3B1.1, comment (n.4).  The Background of this section also notes that "[t]his adjustment is included primarily because of concerns about relative responsibility." The Fourth Circuit observed in *Sayles* and *Slade*, that in cases where it affirmed the application of an aggravating role adjustment under USSG § 3B1.1, there existed evidence that the defendant actively exercised

some authority over other participants in the operation or actively managed its activities. *United States v. Sayles*, 296 F.3d 219, 221 (4th Cir. 2002); see also *United States v. Slade*, 631 F.3d 185, 190-191 (4th Cir. 2011)(observing cases affirming USSG § 3B1.1 enhancement where the defendant "exercised supervisory responsibility over" the activities of a criminal operation and "effectively ran the operation while her husband was ill")(internal citations omitted).

In the alternative, the court should consider decreasing the base offense level for a defendant that is substantially less culpable than the average participant. USSG §3B1.2, comment (n.3(A)).  According to Application Note 4, this reduction is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. USSG §3B1.2, comment (n.4).

However, a defendant that has received a lower offense level by virtue of being convicted of an offense that is less serious than warranted by his actual criminal conduct ordinarily should not.  USSG §3B1.2, comment (n.3(B)).  Courts have applied this note to deny adjustments where, by virtue of the offense of conviction, the defendant's base offense level reflected only their own conduct and not the broader conspiracy. *See United States v. Lucht*, 18 F.3d 541, 555-56 (8th Cir. 1994), *see also United States v. Lara*, 718 F.3d 994, 995-96 (8th Cir. 2013).  Courts have also applied Note 3(B) as applicable to any case where the defendant's base offense level does not reflect the entire conspiracy, regardless of the offense of conviction. *See United States v. Roberts*, 223 F.3d 377, 381 (6th Cir. 2000).

### 1.      Mr. Wilson was not the Mastermind

Mr. Wilson was not the mastermind of the instant offense and it is not appropriate to increase his base offense level as if he were.  The government went to great lengths at trial to describe Mr. Wilson as unqualified to perform the contracts that he received and incapable of even understanding what was being done.  If he lacked the basic understanding to carry out the contracts, then it is inconsistent with the government's logic that he was capable of arranging and directing the activities of Timothy Donelson, Ronald Capallia, Kekoa Lumho, and Barry Atwood, all of whom were much more sophisticated than Mr. Wilson and highly trained in their respective professions. Conversely, at trial, the government characterized Mr. Wilson as an uneducated, ditch-digger from the Florida swampland. Although Mr. Wilson arguably "retained the majority of the proceeds of the offense" (PSR ¶109), that is not the single consideration for this enhancement. §3B1.1, comment (n.4).

Timothy Donelson was the true mastermind and leader of the conspiracy.  He is the individual that connects all the other co-conspirators.  Without Mr, Donelson, Mr. Wilson would have never had occasion to associate with Mr. Lumho because MSO Tech's invoicing began and ended with Level 3.  Mr. Lumho was an extremely skilled IT professional and highly intelligent. His position within the DOD OIG was necessary to the fraud.  In fact, he was in a position to prevent the very fraud he committed. Without Mr. Donelson, Mr. Wilson would have never been put in contact with Barry Atwood who was put in place by Level 3 to manage the bridge contract before Mr. Wilson was awarded the contract.  Mr. Atwood, who had a personal relationship with Mr. Lumho, was in charge of hiring employees for the project and likely facilitated the hiring of Mr. Ramos.

Further, Mr. Atwood initiated the purchase of and received at his residence many of the items the government identified as bribes for Mr. Lumho.  Mr. Donelson was familiar with the government contracting process and was the only person in a senior enough position to facilitate the offense conduct.  This included adding the Level 3 markup to the invoices submitted to Level 3 by MSO Tech.  Mr. Donelson also directed the actions of Ronald Capallia within Level 3. While Mr. Donelson, Mr. Atwood, Mr. Lumho, and Mr. Wilson all served necessary roles within the conspiracy, Mr. Donelson was at the epicenter of authority, as such, Mr. Wilson should not receive a leadership role enhancement.

### 2.        Relative Culpability

Assuming arguendo the Court believes Mr. Wilson was a leader of the offense conduct and relatively more culpable, then an enhancement is not necessary because the charging decisions made by the government already account for the roles and relative culpability of the various co-conspirators. Presumably, Timothy Donelson, Ronald Capallia, Natalie Capallia, Matthew Lumho, and Barry Atwood were counted as the five or more participants in the conspiracy.  Barry Atwood was never charged even though he was likely responsible for hiring Mr. Ramos and "assisted the conspiracy by funneling information and bribe payments/gifts between Wilson and Lumho." PSR ¶37. Natalie Capallia knowingly received "kickbacks paid from MSO Tech" (PSR ¶47) and received immunity from prosecution. Timothy Donelson was charged but not convicted because he is deceased.  Ronald Capallia, who will be discussed in greater detail below, was charged, entered into a plea agreement, and was sentenced to one year and one day by this Court.

The probation officer's calculation of Mr. Wilson's sentencing guidelines resulted in a total offense level of 42, criminal history category I, which corresponds to a sentencing guideline

range of 360 to life.  Notably, Mr. Wilson received an 18-level increase in his base offense level

which reflects the total loss amount of $8,992,544.07 for the entire conspiracy.  As discussed

above, this calculation differs from the calculation submitted by the government to the probation

officer by including a 4-level increase in Mr. Wilson's base offense level for his role in the

offense and a 4-level increase because the offense involved a public official in a high-level

decision-making or sensitive position.

| Guideline | Offense Level |
|---|---|
| Base Offense Level (Section 2X1.1(a)) | 12 |
| Loss amount greater than $3,500,000 but not more than $9,500,000 (Section 2B1.1(b)(1)(J)) | +18 |
| Offense involved more than one bribe (Section 2C1.1(b)(1)) | +2 |
| Offense involved a public official in a high-level decision-making or sensitive position (Section 2C1.1(b)(3)) | +4 |
| The defendant was an organizer or leader (Section 3B1.1(a)) | +4 |
| The defendant willfully obstructed justice (Section 3C1.1) | +2 |
| TOTAL | 42 |

In comparison, the probation officer's calculation of Mr. Capallia's sentencing guidelines

resulted in a total offense level of 33, criminal history category I, which corresponds to a

sentencing guideline range of 135 to 168 months.  Mr. Capallia also received an 18-level

increase in his base offense level which reflects the total loss amount of $8,992,544.07 for the

entire conspiracy.  In its first position with respect to sentencing, the government agreed with

this calculation. (1:17cr223 ECF 61 pg 4)

| Guideline | Offense Level |
|---|---|
| Base Offense Level (Section 2X1.1(a)) | 12 |
| Loss amount greater than $3,500,000 but not more than $9,500,000 (Section 2B1.1(b)(1)(J)) | +18 |
| Offense involved more than one bribe (Section 2C1.1(b)(1)) | +2 |
| Offense involved a public official in a high-level decision-making or sensitive position (Section 2C1.1(b)(3)) | +4 |
| Acceptance of responsibility (Section 3E1.1(a) and (b)(1)) | -3 |
| TOTAL | 33 |

Under these circumstances, where both defendants are held accountable for the total loss amount for the entire conspiracy and neither is convicted of an offense that is less serious than warranted by his actual criminal conduct, the guidelines' objective of ensuring that sentences appropriately reflect the defendants' relative culpability and specific offense conduct is met by increasing Mr. Wilson's base offense level. Although Mr. Wilson would have argued that it was more appropriate to decrease Mr. Capallia's base offense level rather than increase his.

However, the Court ultimately adopted a lower guidelines calculation for Mr. Capallia upon agreement by the parties.

| Guideline | Offense Level |
|---|---|
| Base Offense Level (Section 2B1.1(a)(1)) | 7 |
| Loss amount greater than $3,500,000 but not more than $9,500,000 (Section 2B1.1(b)(1)(J)) | +18 |
| Acceptance of responsibility (Section 3E1.1(a) and (b)(1)) | -3 |
| TOTAL | 22 |

The government advocated for this calculation of Mr. Capallia's sentencing guidelines in its corrected position with respect to sentencing arguing:

> The acts of bribery taken by Capallia's co-conspirators could be attributable to Capallia under § 1B1.3(a)(1)(B), but only if they were reasonably foreseeable to him and in furtherance of the jointly undertaken criminal activity. Here, there is insufficient evidence that Capallia knew about or could foresee the bribery component of the conspiracy at the time. Capallia was aware that LumHo was knowingly approving fraudulent service orders, but the government has not seen evidence that Capallia knew—at the time—that LumHo was taking bribes to do so. Because Capallia neither paid, nor assisted in paying, nor knew about the bribes at the time, the government submits that § 2C1.1 does not govern Capallia's sentencing. The government therefore respectfully submits that § 2B1.1 applies here. (1:17cr223 ECF 63 pg 6)

The government's conclusion that there was insufficient evidence that Mr. Capallia knew about or could foresee the bribery component of the conspiracy at the time contradicts its own evidence at trial.  At a minimum, according to the government Mr. Capallia himself was receiving large sums of money and gifts from Mr. Wilson for his role in the conspiracy which would make it reasonably foreseeable to him that others involved in the conspiracy would also receive money and gifts from Mr. Wilson including Mr. Lumho.  However, the government's evidence was not limited to Mr. Capallia merely receiving money.

According to the government, Mr. Capallia also facilitated providing gifts to Mr. Lumho. At trial, the Government introduced an email sent from Mr. Wilson to Mr. Capallia (Gx176) that included a list of Apple and camera products that the Government argued were bribes from Mr. Wilson to Mr.  Lumho. Mr. Capallia then sent a task order with these products to Mr. Lumho for approval (Gx177). When Mr. Lumho received that task order, he called Mr. Capallia and left him a voicemail (Gx179, Gx179T) requesting that Mr. Capallia remove the items from the task order that Mr. Wilson had asked him to include.  Mr. Capallia testified (Gx511) that he knew he was

providing "various Apple equipment and a camera" to Mr. Lumho instead of the installation services noted on the task order (GX177).

Mr. Capallia further testified that after receiving Mr. Lumho's voicemail, he removed the line items from the order as Mr. Lumho directed him. The implication of this interaction was that both parties knew they were improper gifts to Mr. Lumho and Mr. Capallia changed the order to conceal them.  Finally, in his plea agreement (Gx1207), Mr. Capallia agreed that he "knew that [MSO Tech] would purchase the Apple and Canon products from a retailer, mark up the price, and arrange to have those items delivered directly or indirectly to LumHo."

Certainly, the government could have opposed the guideline calculation proposed by Mr. Capallia and made the above argument that he did in fact know about or could foresee the bribery component of the conspiracy at the time.  However, the government chose not to.  As a result, Mr. Capallia faced a sentencing guideline range that was significantly less serious than warranted by his actual criminal conduct.  His base offense level was decreased by 5 and he did not receive a 2-level enhancement for an offense that involved more than one bribe or a 4-level enhancement for an offense involving a public official in a high-level decision-making or sensitive position.

Even if the Court finds that the reduced guideline range represents more than a mere charging decision by the government, the resulting 11-level reduction in Mr. Capallia's base offense level is much greater than the 8-level range contemplated by the guidelines to serve the guidelines' objective of ensuring that sentences appropriately reflect the defendant's culpability and specific offense conduct. Therefore, the guidelines' objective of ensuring that sentences appropriately reflect the defendant's culpability and specific offense conduct is satisfied by the 11-level reduction of Mr. Capallia's guideline range due to the governments charging decision

and the charging decisions it made with other co-conspirators and it is not appropriate to increase Mr. Wilson's base offense level for his role in the offense and to do so would be unwarranted.

### B.    High Level Public Official

The Probation Officer noted in paragraph 127 of the PSR that Mr. Wilson qualifies for a four-level enhancement because the offense involved a public official in a high-level decision-making or sensitive position pursuant to U.S.S.G. §2C1.1(b)(3).  However, based on the offense conduct Mr. Wilson should not receive this adjustment.

This section provides, in relevant part, "[i]f the offense involved... any public official in a high-level decision making or sensitive position, increase by 4 levels." U.S.S.G. §2C1.1(b)(3). Application Note 4 to § 2C1.1 defines "high-level decision making or sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1 app. n.4(A). It goes on to explain, "[e]xamples of a public official in a high-level decision making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority." *Id*. at n.4(B).

For example, in *United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994), a defendant had bribed a supervisory engineer at the Navy who had responsibility for the technical aspects of major procurements. *Id*. at 1016. In return, the engineer passed nonpublic information to the bribe payer, recommended to a contract review panel that the bribe payer's clients win contracts, and sought to ensure that certain contracts were awarded on a sole-source basis, *i.e.*, without competition. *Id*. at 1016-17. The Fourth Circuit held that the engineer's ability to pass on non-public information and to make recommendations to the Navy about who should be awarded the

contracts meant that the enhancement applied. *Id*. at 1021. In reaching this conclusion, moreover, the court rejected the defendant's argument that the enhancement should not apply because the Naval engineer lacked the power to award contracts on his own. The court explained, "Although [the Contract Award Review Panel ("CARP") on which the engineer served] could not make the final decision that the contracts should be awarded to a particular bidder, senior Navy officials would not likely accept the bid without a favorable report from CARP." *Id*. at 1021.

Recently, the Fourth Circuit affirmed the application of the enhancement for a government employee who "did not have independent authority to award the contract… [but] as the official leading the data migration project, [their] recommendation of who should win the contract was given substantial deference." *United States v. Conrad*, 760 F. App'x 199, 210 (4th Cir. 2019).  In *Conrad*, the defendant worked for the Bureau of Industry and Security ("BIS") within the Department of Commerce. *Id*. at 203. Within the BIS, the defendant served in the Office of the Chief Information Officer ("OCIO") as Director of Operations and Systems Security. *Id*.  BIS used a branch of the Navy known as the Space and Naval Warfare Systems Command ("SPAWAR") to handle the hiring of contractors for technical support and services. *Id*. at 204. Typically, the defendant relied on subordinates to work with a representative from SPAWAR to draft a statement of work and conduct a search for a private contractor. *Id*.  In *Conrad*, however, the defendant deviated from the normal process and facilitated the hiring of the contractor and prepared the statement of work and recommended a private contractor to do the work. *Id*. at 205.  The defendant also reached out to a prime contractor and recommended that same private contractor that was later awarded the contract. *Id*. In the weeks prior to the contract being awarded to the private contractor, the defendant solicited an "investment loan" from the owners of the company. *Id*. at 206.

In the present case the relationship between Mr. Lumho and Mr. Wilson is too attenuated to merit an enhancement compared to those in *Conrad* and *Matzkin*. Here, the testimony by the government's witnesses was clear that, unlike the "substantial influence" wielded by the defendant in *Conrad* or the CARP in *Matzkin*, a DAR does not have the authority to influence whether a prime contractor uses a subcontractor, which subcontractor is selected, or if that subcontractor is awarded a sole-source contract. Further, unlike *Conrad*, there is no evidence that Mr. Lumho attempted to do so; there was no testimony that Mr. Lumho communicated with Level 3 in an attempt to influence which subcontractor they used. To the contrary, the evidence at trial was clear that Mr. Donelson exercised unquestioned influence whether to use a subcontractor, what subcontractor to select, and if that subcontractor was awarded a sole-source contract. Finally, unlike *Matzkin*, Mr. Lumho never passed information directly to Mr. Wilson and the two seldom, if ever, communicated directly during the pendency of the conspiracy.

## II.     Considerations Under §3553(a)

It is well settled that the Sentencing Guidelines are advisory following the Supreme Court's decision in *United States v. Booker*, 125 S.Ct. 738, 757 (2005); see also *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (the court shall consider the sentencing guidelines range as well as other relevant factors set forth in 18 U.S.C. §3553(a) before imposing sentence). As a result, this Court may consider permissible statutory factors such as: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with reasonable rehabilitative opportunities; the kinds of sentences available; the guideline range; the need to

avoid unwanted sentencing disparities; and the need for restitution. Upon consideration of these factors, a sentencing court may find that a case falls outside the "heartland" contemplated by the guidelines, that "the guidelines sentence itself fails properly to reflect the §3553(a) considerations", or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 345-46 (2007).

Therefore, if this Court considers Mr. Wilson's offense conduct in the context of these factors, it is appropriate to impose a variant sentence of 72 months. *See, e.g., Pepper v. United States 131 S.Ct. 1229 (2011); Spears v. United States, 555 U.S. 261 (2009); Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Williams v. New York 337 U.S. 241 (1949)*; *United States v. Pauley, 511 F.3d 468 (4th Cir. 2007)*.

## A.     History and Characteristics of the Defendant

Mr. Wilson is 57-years old and has lived in north Florida for his entire life.  He was raised on a farm in Windsor, Florida, where his family raised cattle and game birds.  Although his needs were met as a child, his family had humble means.  At an early age, Mr. Wilson was responsible for assisting with the care of the animals on his family's farm.  He especially enjoyed caring for the horses.  Mr. Wilson also began volunteering to help others in his community at a very young age.  He would help his father assist others who needed help with farm work, building various structures, and other odd jobs.  This sense of duty to the community continued into his adult life and is described in the numerous letters attached as exhibits that describe how he would give the shirt off his back to help others.  Mr. Wilson regularly donated his time and equipment to help others in the community, for over thirty years, he smoked and donated turkeys to those in need for Thanksgiving and hams for Christmas, and he donated gifts and other necessities to those in need.  During recent flooding in North Florida he used his equipment to

14

help rescue people stranded in their homes.  If his neighbors had a problem, they would call Mr. Wilson.  Whether they needed help burying a pony before "granbabies" got home or bringing his grill and food to a graduation party when the cook never arrived, Mr. Wilson would stop what he was doing and help.  Although Mr. Wilson has a gruff exterior, he is a very caring and empathetic member of his community.

Mr. Wilson has a very close-knit family.  He is an only child and is very close to his mother and father.  Unfortunately, his father passed away in August of 2019 from cancer at the age of 93 and his mother is, who is 79, is also suffering from cancer and underwent surgeries, chemotherapy, and radiation while Mr. Wilson has been incarcerated. Mr. Wilson takes his duty as a son very seriously and is concerned about his mother's care and support while he is incarcerated. Mr. Wilson is also a caring father, stepfather, and grandfather.  While he has a stern and often brash delivery, he has cultivated a loving relationship with all of his children and stepchildren.  Especially with his stepchildren, he has always endeavored to make them feel like part of his family by providing for them and caring for them.

Mr. Wilson graduated from high school and attended one year of college.  After college he worked for the Florida Department of Corrections for 8 years. He informed the probation officer that he left that position because "he wasn't cut out to ride around, shoot guns, and play." Instead, Mr. Wilson was used to hard work outdoors on the farm.  He started a landscaping company and built up for four years until he sold it to one of his employees and founded PVS. Mr. Wilson, through his hard work, transitioned to building cell phone towers and networks for AT&T and Altel.  Again, through his hard work, Mr. Wilson transitioned from building cell phone towers to building mobile switching offices for Nextel and later to laying fiber optic cables for Level 3.  Prior to the offense conduct, Mr. Wilson spent 20 years building his business

from scratch and gradually transitioning to more complicated projects because of his strong work ethic.  Many of the reference letters attached observe how Mr. Wilson is the hardest worker that they know.

Mr. Wilson was able to build his business despite being diagnosed with squamous cell carcinoma in his stomach and groin in February of 1999.  He underwent surgery to remove the tumor and eight weeks later had another surgery to remove over 200 lymph nodes.  As a result, Mr. Wilson has a testosterone deficiency and requires testosterone injections every fourteen days. However, he has not received them while in custody.  Mr. Wilson is also not able to receive a COVID-19 vaccine because he had so many lymph nodes removed placing him at greater risk to contract COVID-19, which he has had twice while incarcerated in Alexandria.  For the same reason he is also unable to receive the seasonal flu shot.  Mr. Wilson broke his hip after falling off of a bulldozer and suffers from sciatic nerve pain which affect his mobility.  Mr. Wilson also suffers from gout and has trouble sleeping on hard surfaces due to swelling in his right leg which also affect his mobility.  Unfortunately, these conditions have worsened during his incarceration.

      **B.**      **Equity, Fairness, and Deterrence**

A sentence of 72 months followed by a three-year term of supervised release would sufficiently reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes.  The public does not require any further protection from Mr. Wilson nor is there a reason to believe he will reoffend.  The crimes for which he was found guilty were made possible through his relationship with Tim Donelson, who is deceased, and Level 3.  His security clearance was suspended and, through the debarment process, he will be prohibited from performing in any capacity on any

future government contracts.  Moreover, there is no indication that Mr. Wilson has engaged in any similar criminal behavior apart from the charged conduct and he has no prior criminal convictions.

Mr. Wilson also appears to be a low risk to reoffend based on available objective empirical evidence. According to the United States Sentencing Commission, a male Criminal History Category I offender over the age of 50, like Mr. Wilson, has a historical general recidivism rate of 6.2%, which is *the lowest reported recidivist rate* in the Commission's study.[3] The general recidivist rates coupled with Mr. Wilson's history and personal characteristics leave little doubt that he will not reoffend and strongly militate in favor of a substantial variance from the advisory Guideline range.[4]

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct.  The unique combination of motivation and circumstance that lead otherwise law-abiding citizens to

---

[3] *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

[4] *See United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first offender status); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history and strong family ties); *See, e.g., United States v. Huckins*, 529 F.3d 1312, 1318-19 (10th Cir. 2008) (a district court "may weigh a defendant's lack of a criminal record" in deciding whether to grant a downward variance from the advisory Guidelines range "even when the defendant has been placed into a criminal history category of I"); *United States v. Smith,* 2008 WL 1816564 *4 (4th Cir. 2008) (affirming downward variance based in part on the defendant's "exemplary life" and lack of a criminal history); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

risk prosecution and imprisonment are not so easily overcome by the simple imposition of

lengthy sentences.  While such a theory might be appealing on its face, the reality is that there is

little to no difference in the deterrent effect between probation and imprisonment.[5]  Indeed,

available research suggests that the *certainty* of being caught and punished carries far greater

deterrent effect than the *severity* of the punishment.[6]  More importantly, no one with knowledge

of this case and the consequences of Mr. Wilson's investigation, trial and now conviction, would

begin or continue a course of criminal conduct merely because this Court imposed a variant

sentence.

      The sentence proposed in this motion will serve as an appropriate deterrent for those who

would consider engaging in similar conduct as Mr. Wilson.  Not only will this case result in a

lengthy period of incarceration and make Mr. Wilson a convicted felon at age 57, he will never

again work for the government and he will struggle to rebuild his business that relies on his labor

at a time when his ability to earn and save for retirement is substantially limited.[7]  Regardless of

the ultimate sentence, Mr. Wilson and his family have suffered significantly as a result of his

---

[5] See Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); see also Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

[6] See also David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

[7] *See, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v.* Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

conviction and incarceration.  His conviction and punishment are meaningful reminders that even a life characterized by over 50 years of hard work and honest and lawful behavior can be undermined by a lack of judgment towards the end of a long career.  *See e.g., United States v. Howe*, 543 F.3d 128 (3rd Cir.  2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"). The result is that Mr. Wilson will serve a lengthy prison sentence, be separated from his family, and lose his business and financial stability.

It is also noteworthy that Mr. Wilson was incarcerated on December 6, 2019, immediately before the COVID-19 pandemic began.  As the Court is aware, conditions in the Alexandria Detention Center have been especially difficult during the pandemic.  Mr. Wilson, contracted COVID-19 twice and along with the other inmates, was subjected to extended periods of lock-down and other movement restrictions.  This impacted his ability to communicate with his family and took a toll on his mental and physical health. Programs within the jail were also intermittently cancelled. Nevertheless, Mr. Wilson did not have any infractions during his incarceration.  As one might expect, even with COVID-19 looming, Mr. Wilson continued to work and assisted Support Services with repainting the minimum custody units on the first floor of the jail.

Mr. Wilson also sought mental health services as soon as he arrived in Alexandria.  This included alcohol abuse, grief counseling due to the loss of his father, and anger management. Due to the COVID protocols, Mr. Wilson requested that his therapist modify various programs that had been suspended and incorporate them into his individual therapy.  Throughout the therapeutic process Mr. Wilson also asked for his wife to be included and she was actively

involved in the process.  Mr. Wilson's therapist described the tremendous effort he made during his incarceration to learn from his past and move forward to a healthier life.  He also provided support to his peers and jail staff.  Certainly, a sentence of 72 months is sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes.

### C.       The Guideline Range / The Need to Avoid Sentencing Disparities

A sentence of 72 months followed by a three-year term of supervised release adequately reflects the guideline range and avoids unwarranted sentencing disparities. This Court should give less weight to the advisory Guideline range because the dramatic 18-level enhancement, based on the amount of loss, is not supported by empirical evidence and the 4-level enhancement, based on a high-level public official, fails to fairly distinguish one defendant from another.

As the Supreme Court noted in *Kimbrough, infra*, the Sentencing Commission has a distinctive, institutional role of basing its determinations on empirical data and national experience; their suggested sentencing ranges are meant to use that data and experience to "reflect a rough approximation of sentences that might achieve [18 U.S.C.] §3553(a)'s objectives." When a Guideline range is not the product of "empirical data and national experience," courts have the discretion to conclude that the recommended sentence fails to achieve the purposes of federal sentencing under 18 U.S.C. § 3553(a).[8]  Courts have recently criticized the role that the Guidelines play in increased incarceration rates through the overly

---

[8] *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *see also United States v. Nolasco-Ramirez*, 391 F. App'x 309, 311 (4th Cir. 2010) (finding that courts are "free to consider policy decisions behind the Guidelines, including the presence or absence of empirical data…."); *see generally United States v. Engle*, 592 F.3d 495, 502 (4th Cir. 2010) ("We recognize that in the post-Booker sentencing world, district courts must give due consideration to relevant policy statements, but those policy statements are no more binding than any other part of the Guidelines. Accordingly, district courts may 'vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines.'" (quoting *Kimbrough*, 552 U.S. 85 at 101).

formulaic and loss motivated enhancements that attend to crimes with financial gains or losses. The increase in the Guidelines range that derives from the loss table at U.S.S.G. § 2B1.1(b)(1) results in unjustifiable sentencing ranges.[9]  *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [§ 3553(a)] and…effectively guaranteed that many such sentences would be irrational on their face.").[10]  Although some district court judges have written memorandums to document their disagreements with the loss tables, others have expressed it through their sentences.  The Court should do the same with Mr. Wilson's sentence.

Similarly, when the Guidelines fail to fairly distinguish one defendant from another, a district court can grant policy-based variances that are not subject to "closer review" because such variances are "not suspect." *See Kimbrough*, 552 U.S. at 109, *Spears v. United States*, 555 U.S. 261 at 264 (2009), *Rita v. United States*, 551 U.S. 338, 348 (2007). As discussed in greater detail above the probation office imposed a four-level enhancement because the offense involved a public official in a high-level decision making or sensitive position pursuant to U.S.S.G. §2C1.1(b)(3). However, the Fourth Circuit has upheld the district court's liberal application of this enhancement to the point where it no longer adequately differentiates between defendants. In fact, the government relies on *Matzkin* to justify applying this enhancement to Mr. Wilson

---

[9] In the words of one district judge: "The Sentencing Commission to this day has never been able to articulate why it has two points for this, or four points for that.  These are just numbers. And yet once they are placed the whole thing is blessed and said to be rational."   *See* http://www.mainjustice.com/justanticorruption/2013/03/11/rakoff-scrap-dangerous-sentencing-guidelines/.

[10] *See also United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (lamenting the advisory guideline range in a fraud case that revealed "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *see also United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (stating that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *see also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("The guidelines provisions for theft and fraud place excessive weight on this single factor [loss/gain], attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relative weak indicator of the moral seriousness of the offense or the need for deterrence.").

because it creates such a low bar that it can be applied to any government official who receives a bribe.  As a result, the Court should disregard its application.

A sentence of 72 months also avoids unwarranted sentencing disparities between the co-defendants in this case.  Ronald Capallia received one year and one day for his offense conduct which is a significant variance below his guidelines and, in part, the result of his timely plea and cooperation.  However, his role is also distinguishable from the other conspirators which is reflected in the alternative guidelines that the government chose to adopt for Mr. Capallia.

Mr. Lumho received a sentence of 90 months for his necessary role in the offense as the government official.  However, as discussed above, his position within the government and sophistication suggest that he is more culpable than Mr. Wilson regardless of the percentage of the proceeds that he received.  Likewise, as the Court observed, Mr. Lumho testified untruthfully at both trials and forced his father-in-law to testify at both trials.  At sentencing for Mr. Lumho, the government argued that he also set up a bank account for his father-in-law to receive the bribes which revealed his criminal sophistication.  Mr. Wilson is not as sophisticated as his co-conspirators and he did not have a position of influence like Mr. Lumho and Mr. Donelson.  While he testified at prior hearings and the first trial, he did not testify at any hearings after present counsel became involved in the case.  For these reasons, a sentence of 72 months is appropriate.

## III.   Conclusion

For the foregoing reasons, Mr. Wilson respectfully requests that this Court impose a sentence of 72 months followed by a three-year term of supervised release.  Mr. Wilson further requests that this Court recommended his participation in the RDAP program to address his alcohol abuse and that he serves his sentence at FCI Coleman.

Date:  February 1, 2022

Respectfully submitted,

William S. Wilson

By: /s/ *Andrew M. Stewart*                    .
Andrew M. Stewart
Virginia State Bar No. 68683
Attorney for William S. Wilson
Dennis, Stewart & Krischer PLLC
2007 15th Street North, Suite 201
Arlington, VA 22201
Telephone: 703-248-0626
Facsimile: 703-248-8971
andrew.m.stewart.esq@gmail.com

and

By: /s/ *Stuart A. Sears*                    .
Stuart A. Sears
Virginia State Bar No. 71436
Attorney for William S. Wilson
Schertler, Onorato, Mead & Sears LLP
901 New York Ave., NW, Suite 500 West
Washington, DC  20001
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177
ssears@schertlerlaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of February 2022, I electronically filed the foregoing motion with the clerk of the court using the CM/ECF system, which will send an electronic copy to the following:

Matthew Burke

and

Russell Carlberg
Assistant United States Attorney
U.S. Attorney's Office, Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

By:  <u>/s/ <i>Andrew M. Stewart</i>        </u>.
ANDREW M. STEWART, ESQ.
Virginia State Bar No. 68683
Attorney for the Defendant
2007 15th Street North, Suite 201
Arlington, VA 22201
Phone: 703-248-0626
Fax: 703-248-8971
andrew.m.stewart.esq@gmail.com
